## Commonwealth v. Eggert

*Jason William Whalley,* for Commonwealth.

*Timothy Peter Wile, assistant public defender,* for defendant.

CARPENTER, *J.,* July 26, 2010—

## FACTUAL AND PROCEDURAL HISTORY

Appellant, Troy A. Eggert, appeals from the judgment of sentence imposed on May 10, 2010, following his conviction of driving under the influence[1] and careless driving[2] at a bench trial.

The bench trial established the following facts. On October 2, 2008, at approximately 8:05 a.m., Officer

---

1. 75 Pa.C.S. §3802(d)(2).
2. 75 Pa.C.S. §3714(a).

Christopher Daniel of the Lower Moreland Police Department responded to a motor vehicle accident involving four vehicles at Red Lion Road, between Pine and High Roads, Lower Moreland Township, Montgomery County. (Bench trial 3/9/10 pp. 5-6.) The officer approached appellant's vehicle as the primary vehicle, because it appeared to be the one that caused the accident. *Id.* at 6-7. Upon approaching, Officer Daniel observed that appellant was in semi-conscious state, his pupils were constricted and he was shaking. *Id.* at 7, 10. Appellant was non-verbal at first, and he was unable to answer the officer's simple questions. *Id.* at 8. Appellant was confused and it appeared that he did not know where he was. *Id.* at 8, 10. When Officer Daniel was able to speak to appellant, he observed that appellant's speech was slurred, slow and confused. *Id.* at 11. Appellant did not appear to have a recollection as to what happened prior to the accident and immediately after the accident. *Id.* Appellant was then transported for treatment and testing to Holy Redeemer Hospital. *Id.*

Based upon the officer's observations, training and his involvement with the Montgomery County Drug Task Force, the characteristics that appellant displayed indicated the potential influence of a controlled substance. *Id.* at 10. Accordingly, Officer Daniel requested that appellant submit to chemical testing, to which appellant agreed. *Id.* at 12. Appellant's blood was drawn at approximately 9:15 a.m. *Id.*

Several hours after appellant was released from the hospital, appellant responded to the police department at Officer Daniel's request. Appellant showed the officer proof of the medications he was currently taking and

took prior to the accident. *Id.* at 18. In particular, appellant provided proof that he was currently prescribed Endocet. See "C-1."

At the bench trial, Dr. Edward Barbieri, an expert in forensic toxicology at the National Medical Service Laboratory,[3] testified on behalf of the Commonwealth. *Id.* at 21-24. Dr. Barbieri received appellant's two blood samples on October 3, 2008, and performed a panel of narcotic analgesics the following day. *Id.* at 25-26. Dr. Barbieri explained the procedure and the method of the test, the results of which are documented in the report authored and signed by him on October 21, 2008. See "C-2"; (Bench trial 3/9/10 pp. 26-28). The report indicates the presence of Oxycodone in appellant's blood sample at a concentration of 170 nanograms per millileter. *Id.* at 29. In significant part, the report reads, "[b]ased on the concentration of Oxycodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment, evidence of erratic driving, unusual demeanor, then this substance can be responsible." See "C-2." Endocet, for which appellant had a prescription, contains Oxycodone. *Id.* at 30.

It was also Dr. Barbieri's opinion that the impairment as described by Officer Daniel is consistent with the concentration of Oxycodone found in appellant's blood sample. *Id.* at 29. Dr. Barbieri also opined that the level of Oxycodone found in appellant's blood, is typically a high amount of the drug. *Id.* at 30.

---

3. We took judicial notice that NMS is a laboratory certified and approved by Pennsylvania to determine a variety of intoxicants under the Vehicle Code. (Bench trial 3/9/19 p. 27.)

In reading the prescription label, Dr. Barbieri observed that the prescription called for two tablets by mouth every four hours as needed for pain. *Id.* Dr. Barbieri opined that if the Endocet was taken as directed, the Oxycodone level would not have been 170 nanograms per millileter. *Id.* at 30-31.

After the Commonwealth rested its case, appellant testified on his own behalf. Appellant testified as to the underlying reasons why he was prescribed Endocet. *Id.* at 34-36. Appellant also testified that he last took the prescribed dose of Endocet around 2 a.m. or 3 a.m., six to five hours before the accident occurred. *Id.* at 43.

At the conclusion of the trial, we found appellant guilty of driving under the influence and the summary offense of careless driving. *Id.* at 46.

On May 10, 2010, we sentenced appellant to a term of 72 hours to six months imprisonment for driving under the influence, and imposed a fine on the summery offense. (Sentencing 5/10/10 p. 5.)

## ISSUES

I. *Whether There Is Sufficient Evidence To Sustain Appellant's Conviction for Violating 75 Pa.C.S. §3802(d)(2)*

## DISCUSSION

I. *There Is Sufficient Evidence To Sustain Appellant's Conviction for Violating 75 Pa.C.S. §3802(d)(2)*

Appellant contends that where the impairing substance is a prescription medication, the Commonwealth is re-

quired to present expert testimony to establish a casual nexus between the amount of prescription medication found in the motorist's blood and the effect of that amount of prescription medication on the motorist's ability to safely drive. In support of this proposition appellant cites *Commonwealth v. DiPanfilo,* 993 A.2d 1262 (Pa. Super. 2010); *Commonwealth v. Griffith,* 985 A.2d 230 (Pa. Super. 2009) and *Commonwealth v. Etchison,* 916 A.2d 1169 (Pa. Super. 2007). See concise statement, issue 1(a).

On appeal, appellant argues that in this case the Commonwealth failed to establish a sufficient nexus between the prescription medication, *i.e.,* 170 nanograms of Oxycodone per millileter, found in his blood and any impairment of his ability to safely drive at the time of the motor vehicle accident so as to find him guilty beyond a reasonable doubt of violating 75 Pa.C.S. §3802(d)(2). See concise statement, issue 1(b).

Also on appeal, appellant argues that Dr. Barbieri's expert opinion was legally insufficient, and cites *Griffith,* in support of this contention. See concise statement, issue 1(c).[4] Because all of appellant's issues are interrelated we will address them simultaneously.

In *DiPanfilo,* our Superior Court reiterated its standard of review and the key elements of the substantive law in this area as set forth in *Griffith* as follows:

---

4. Appellant does not elaborate as to why Dr. Barbieri's expert opinion was not legally sufficient; therefore, we have assumed that he contends that Dr. Barbieri's opinion was insufficient for the reason that Dr. Barbieri did not establish a casual connection between the level of Oxycodone and the extent of impairment.

"As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecutor the benefit of all reasonable inferences to be drawn from the evidence.

"Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty, and may sustain its burden by means of wholly circumstantial evidence. Significantly, we may not substitute our judgment for that of the fact-finder; if the record contains support for the convictions they may not be disturbed. . . . Any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn for the combined circumstances." *DiPanfilo,* 993 A.2d at 1264 (citing *Griffith,* 985 A.2d at 233).

Section 3802(d)(2) of the Vehicle Code defines the circumstances under which an individual who has consumed controlled substances may not operate a motor vehicle. That section provides:

"*(d) Controlled substances.*—An individual may not drive, operate or be in actual physical control of the movement of a vehicle under any of the following circumstances: . . .

"(2) The individual is under the influence of a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate or be in actual

physical control of the movement of the vehicle." 75 Pa.C.S. §3802(d)(2).

It is clear that *DiPanfilo, Griffith* and *Etchison* all set forth the "need for expert testimony in the area of prescription drugs" to establish a connection between the presence of a prescription drug in a defendant's bloodstream and his inability to safely operate a motor vehicle, *DiPanfilo,* 993 A.2d at 1267. In reaffirming the need for expert testimony regarding prescription drugs, the *DiPanfilo* court explained that the "reasoning behind that holding stems from the fact that the side effects of prescription drugs may not be widely or publically known, particularly when they are used to treat an underlying medical condition." *DiPanfilo, supra.*

In this case, the Commonwealth did present the expert testimony of Dr. Barbieri that explained to this court the side effects that 170 nanograms of Oxycodone per millileter can have. Dr. Barbieri stated that Oxycodone in this concentration would cause the impairment as described by Officer Daniel, Dr. Barbieri was present in the courtroom when Officer Daniel testified that at the scene of the accident he found appellant in a semi-conscious state and shaking. Appellant was confused as to where he was and to what had just happened. He had slurred speech and constricted pupils.

Additionally at trial, Dr. Barbieri testified that the amount of Oxycodone found in appellant's blood is a high level of the drug, more than is normally seen from a therapeutic administration of Endocet. Further, Dr. Barbieri opined that that if taken as prescribed, it is unlikely that appellant's Oxycodone level would be 170 nanograms per millileter.

Further, this court considered the NMS laboratory report authored by Dr. Barbieri in which he stated, "[b]ased on the concentration of Oxycodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment, evidence of erratic driving, unusual demeanor, then this substance can be responsible." See "C-2."

Accordingly, this court was fully aware of the effects that 170 nanograms of Oxycodone per millileter had on appellant's ability to operate a motor vehicle, Dr. Barbieri's expert opinion was legally sufficient.

## CONCLUSION

Based on the forgoing analysis, the May 10, 2010 judgment of sentence should be affirmed.